Wisconsin Bridge and Iron Company, Appellant, v. Missouri-Illinois Bridge Company, Appellee.

Gen. No. 36,386.

Opinion filed October 10, 1933.

WINSTON, STRAWN & SHAW, for appellant; JOHN D. BLACK, HAROLD A. SMITH and FRANK B. GILMER, of counsel.

RYAN, CONDON & LIVINGSTON, for appellee; DAVID J. GREENBERG and JOHN M. TUOHY, of counsel.

MR. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court.

This appeal seeks to reverse a judgment of the circuit court entered in an action of assumpsit brought by plaintiff, the Wisconsin Bridge & Iron Company, a corporation, against the Missouri-Illinois Bridge Company, a corporation, to recover $24,058.90, principal and interest claimed to be due April 5, 1929, on a written contract, for the erection of the superstructure of a bridge to span the Mississippi river from Louisiana, Missouri, to the Illinois side of the river.

Defendant paid $325,387.61 on the contract price and refused to pay the balance sued for on the ground that it was entitled to withhold that amount as liquidated damages. On the trial the parties agreed that $22,400 was the amount withheld.

At the conclusion of all the evidence offered by both plaintiff and defendant, the trial court held that defendant was entitled to withhold the above amount and, on motion of defendant, directed the jury to bring in a verdict for defendant. Upon return of the verdict judgment was entered against plaintiff, and in favor of defendant for costs.

The declaration alleged the making of the contract for building the superstructure of the bridge and the agreement of defendant to pay therefor; that plaintiff completed the superstructure in accordance with the terms of the contract and that defendant paid certain sums on account, but did not pay in full and is indebted to plaintiff for the balance sued upon; that certain printed specifications attached to and made a part of the contract provided that if either defendant (called purchaser), or plaintiff (called contractor), considers itself aggrieved by any decision of the engineer interpreting the drawings or specifications, it may require the dispute to be finally and conclusively settled by the decision of the arbitrators; that after completion of the work and after the amount due plaintiff was payable, demand was made of defendant for the payment of such balance and defendant refused to pay same. Whereupon plaintiff delivered to defendant a written demand for arbitration in accordance with the contract; that defendant refused to reply to this demand, refused to appoint an arbitrator and refused to arbitrate the matter.

Defendant filed a plea of the general issue and a special plea setting up a certain paragraph of the contract concerning liquidated damages for delaying completion of the bridge; alleged that the bridge was not completed within the time provided by the contract, but was delayed 194 days; that the engineer referred to in the contract decided that 105 days of the delay was caused solely through the fault of plaintiff; and

that by reason of such delay there became due and owing to defendant as liquidated damages $22,400, which amount defendant withheld.

Plaintiff filed a replication alleging that the delay in the completion of the bridge was not caused through the fault of plaintiff, nor through causes directly under its control for a period of 105 days, nor for any other period.

No point is directly raised upon the pleadings, except in so far as the trial court held by direction of the verdict that the demand for arbitration was immaterial, and plaintiff did not have the right to require an arbitration in view of the determination by the engineer that 105 days of the delay in the completion of the bridge was caused solely through the fault of plaintiff.

To determine the issues presented by this appeal it is necessary to consider the contract, and certain clauses of the specifications which were made part of the contract, and which are as follows:

"CONTRACT

Between

"Contractor: { Wisconsin Bridge & Iron Company North Milwaukee, Wisconsin.

And

"Purchaser: { Missouri-Illinois Bridge Company

For
Contract No. 2, Superstructure
Mississippi River Bridge
at Louisiana, Missouri
Date
October 6, 1926

"MEMORANDUM OF AGREEMENT, Made and signed this 6th day of October, 1926, by and between Missouri-

Illinois Bridge Company, a Corporation of the State of Missouri, the party of the first part, and sometimes termed in this agreement and in the specifications the 'Purchaser,' and Wisconsin Bridge & Iron Company, a Corporation of the State of Wisconsin, the party of the second part, and sometimes termed in this agreement and in the specifications the 'Contractor.'

"Now This Agreement Witnesseth:

"First: The Contractor, for and in consideration of certain payments to be made to him as hereinafter specified, hereby covenants and agrees to perform and execute all of the provisions of the Plans, Specifications, and Proposal and Bid hereto attached and made a part hereof, and to execute in entirety all of Contract No. 2 for Superstructure and to fully finish and complete the same by November 1, 1927, all in accordance with the Plans and Specifications and such directions as the Engineers may give.

"Second: In consideration for the performance by the Contractor of his covenants and agreements as herein set forth, the Purchaser hereby covenants and agrees to pay the Contractor according to the schedule of prices set forth in the attached Proposal and Bid at the time and in the manner stated in the specifications.

"Third. *If the Contractor for Contract No. 1, Substructure fails to complete his work within the times herein specified, and if in the Engineer's opinion such failure causes delays to this Contractor, suitable extensions of time to be determined by the Engineers, shall be granted, with due consideration for altered weather and river conditions which may occur under such extended times;* and if such delays should require the storing of superstructure metal work at places other than the bridge site, the Engineers shall be authorized to include in monthly estimates suitable allowances on such stored material. (Italics ours.)

"Fourth: The concrete pavement in Mansion Street shall be ready for traffic by May 15, 1927."

"Clause No. 4, Sec. S. SCÒPE OF CONTRACTS.

"The work of construction may be divided into four contracts and Contractors may bid upon any or all of them. Contract No. 1, for substructure, will include furnishing all materials and constructing complete all piers, pedestals and abutments; Contract No. 2, for superstructure, will include furnishing, manufacturing, and erecting all the superstructure including the reinforced concrete floor, the pavement thereon, and the lighting system on both steel structure and embankments; Contract No. 3, for grading and paving, will include the grading and paving in Mansion Street between Third street and the end of the bridge, the construction of the embankment and pavement thereon at the Illinois end of the structure, and the fences on embankment; Contract No. 4, for the entire bridge will include furnishing all materials and constructing the entire project including everything covered under Contracts 1, 2 and 3."

(Contracts were let separately. Plaintiff was awarded contract No. 2 for superstructure only.)

"Clause No. 5, Sec. S. PROGRAM OF CONSTRUCTION AND TIMES OF COMPLETION.

"The entire structure is to be completed ready for traffic November 1, 1927. The several contractors shall conduct their operations in harmony with a general program of construction to be arranged to the satisfaction of the Engineers when the contracts are let, and designed to secure the earliest practicable completion of the work. The sub-structure shall be completed consecutively from one end of the bridge so that the superstructure may be delivered and erected in the same consecutive order.

"Clause No. 6, Sec. S. LIQUIDATED DAMAGES FOR DELAYED COMPLETION.

"The bridge is to be operated as a toll structure and delay in the completion will cause loss to the Purchaser not only of interest on the investment, but also loss of earnings, hence the times of completion are essential elements of the contract. To cover partially such losses the Purchaser shall deduct from any payments due or which may become due the Contractor for the substructure, as liquidated damages fixed and agreed to in advance, the sum of $200.00 for every day, Sundays included, of delay in completing the piers according to the above schedule, which delays the erection or delays the final completion of the bridge. The dates set for completion contemplate average conditions of river during the intervening period. The substructure Contractor shall provide cofferdams and equipment so that he can work without interruption up to at least a stage of 12 ft. above low water. If, in the opinion of the Engineers, a greater than normal amount of water above elevation 12 occurs and delays the Contractor's operation, there shall be allowed a corresponding number of days, as may be determined by the Engineers, beyond the dates above mentioned for completing a part, and for completing all of the piers without the assessment of liquidated damages against the Contractor.

"For any delay in completion of the entire bridge beyond November 1, 1927, the Purchaser shall deduct from payments due or which may become due the Contractor erecting the superstructure the sum of $200.00 per day; but if the substructure is constructed by a separate Contractor, and if in the opinion of the Engineers, the erection is delayed solely by delays in completion of parts or all of the substructure beyond the dates herein specified, allowance shall be made for the number of days of such delay.

"In addition to such liquidated damages, the Purchaser shall also deduct from payments which may

become due the Contractor for any contract, the sum of $400.00 per month to cover all costs of engineering supervision and inspection applied to said contract after the required dates for completion.

"Clause 1, Sec. R-O. ARRANGEMENTS OF SPECIFICATIONS.

"For convenience of reference and index, the specifications are divided into Sections, which are further divided into numbered clauses with headings. *Any particular arrangement or order of these divisions and subdivisions, or the wording of any heading shall have no bearing on the interpretation, nor any limiting effects upon parts or the whole of the specifications.* . . . (Italics ours.)

"Clause 2, Sec. R-O. SUPERVISION AND INSPECTION.

" . . . *If either the Purchaser or the Contractor considers himself aggrieved by any decision of the Engineer interpreting drawings or specifications, he may require the dispute to be finally and conclusively settled by the decision of arbitrators, one to be appointed by the Purchaser and a second by the Contractor.* In case the two arbitrators thus chosen fail to agree a third arbitrator shall be appointed by...... *By the decision of these arbitrators, or by that of the majority of them, both parties to this agreement shall be finally bound.*" (Italics ours.)

"Clause 16, Sec. R-O. DELAYS AND DELAYED COMPLETION.

" . . . If it appears to the Engineers that the Contractor is delayed by conditions beyond his control, or by conditions of weather, times and seasons, and rivers or streams, so unusual as not to be reasonably anticipated, additional time for completion of the contract will be allowed, to be determined and fixed by the Engineers and Purchaser. . . . "

It appeared that it was decided by the engineer, and the parties agreed, that construction of the bridge

would be commenced on the west or Missouri side of the river; that the contract for the substructure called for the building of a concrete abutment on a high bluff on the western shore of the river to support the Louisiana, Missouri, end of the bridge; five concrete pillars about 90 feet high at various points in the river, toward the Illinois side, to carry the truss spans and concrete pedestals of various heights on the flat, on the Illinois side of the river, to support the girder spans comprising the approach to the bridge on that side; that the concrete piers in the river were numbered, beginning with the westernmost pier, as Nos. 1, 2, 3, 4 and 5; that the metal truss spans composing the bridge proper were all 312 feet long, except the center span which was 417 feet; and that the spans were designated as Nos. 1, 2, 3, 4 and 5, No. 1 span being built from the concrete abutment on the west side of the river to pier No. 1, which was just at the edge of the water, No. 2 from pier No. 1 to pier No. 2, and so on.

It further appeared that under the terms of the contract piers No. 1 and No. 2 were to be completed by June 1, 1927, but because of circumstances over which the substructure contractor had no control and for which it was not held responsible, they were not completed until August 22, 1927, 83 days later than the contract provided; that the delay in the construction of piers Nos. 1 and 2 delayed the plaintiff in the erection of the superstructure, for which delay the engineer advised defendant that plaintiff was entitled to an allowance of 82 days' extension of time for the completion of the bridge (contract provided for completion November 1, 1927); that while the spans were being put in place they required temporary support and this was afforded by erecting temporary "bents," two between each pair of piers, about equally spaced, and these were built by driving two clusters of piles, one

upstream and one downstream, about the width of the bridge apart, connecting them with crossbeams, putting steel tops on the clusters of piles and a steel "tower" or framework from the top of the piling up to the level of the bottom of the bridge; that, after the upper arch of the truss was completed, these "bents" and the pilings were removed, and that until the upper arch was completed these "bents" carried most of the weight of the superstructure; that plaintiff had completed span No. 1, August 3, 1927, and had pushed out span No. 2 halfway toward pier No. 2 at the time pier No. 2 was completed, August 22, 1927; that September 6, 1927, when span No. 2 was nearing completion, requiring only a few days' more work to reach and tie to pier No. 2, the piling and "bents" slipped out from under it and span No. 2 fell into the river; that August 3, 1927, a conference was held in an effort to expedite the erection of the bridge and plaintiff agreed that it would endeavor to conform to a new schedule for the completion of the various stages of the building of the piers and the erection of the superstructure; that while the work of removing the wreckage of span No. 2 from the river was in progress, the work of driving piling for the falsework or "bents" for the other spans continued, and span No. 2 was completed by the use of the steel that was on the ground for span No. 4; that September 18th or 20th, work was started driving piles for "bents" for span No. 3, and continued across the river for the other spans; that about October 10, 1927, high water carried out the piling that had been driven for spans No. 3 and No. 4; that the new span No. 2 was completed about December 1, 1927, and "bents" had been placed on top of new sets of piling that had been driven for span No. 3, when the weather turned cold and ice began to come down the river, cutting the piling, some of the piles being cut clear off; that about December 12, 1927, the "bents" for span No. 3 were

taken down in order to save them, and from that time until January ice froze around and took out some of the clusters of piles; that when the river froze about December 12th, rendering it impossible to work on the truss or river spans, plaintiff proceeded with the erection of the girder spans on the east side of the river that constituted the eastern approach to the bridge proper; that the heavy ice finally went down the river about February 20, 1927. It also appeared that there was no time between December 5 or 8, 1927, until the last week in February, 1928, when it was safe to put the falsework in the river to sustain the spans of the bridge because of the high water and ice; that February 27, 1928, plaintiff started to put in the falsework or "bents" for spans Nos. 3, 4 and 5, and the work on the spans was pushed with a crew of workmen from each end; that thereafter sleet, wind and rain prevented the men from working at least seven days, inasmuch as it was unsafe on these days to work on slippery steel 100 to 150 feet above the river; and that all of the steel in the superstructure had been put in place March 30, 1932.

Plaintiff contends that the delay of 83 days in the completion of pier No. 2, by the contractor building the piers, entitled plaintiff, under the terms of the contract, to a positive extension of time from November 1, the date provided in the contract for the completion of the superstructure, of 83 days, or until January 22, 1928; that ice appeared in the river about December 8, 1927, making it impossible to work on the spans above the river until the ice went out about February 20, 1928; that due consideration for altered weather and river conditions again extended the time of plaintiff for the completion of the bridge; that the plaintiff actually completed the work well within the time that it was entitled to under the contract under all of the existing conditions, and that therefore de-

fendant had no right to withhold any part of the payments due under the contract.

Defendant's theory is that the engineer had the sole right to determine whether plaintiff was delayed by conditions beyond his control or by conditions of weather, river, etc., and to determine the number of days' allowance for such delay; and that the finding of the engineer that plaintiff was chargeable with 105 days' delay is conclusive.

The printed specifications were attached to and explicitly made a part of the contract. Clause 1, sec. R-O., of the specifications, provided that any particular arrangement or order of the divisions or subdivisions, or the wording of any heading "shall have no bearing on the interpretation or any limiting effect upon parts or the whole of the specifications."

Defendant insists that under the contract the engineer's decision is final on the number of day's delay in the completion of the bridge which are chargeable to plaintiff, and points to clause 3 of the contract, which is as follows:

"Third: *If the Contractor for Contract No. 1, Substructure fails to complete his work within the times herein specified, and if in the Engineer's opinion such failure causes delays to this Contractor, suitable extensions of time to be determined by the Engineers, shall be granted, with due consideration for altered weather and river conditions which may occur under such extended times; . . .*"

We have carefully examined the cases cited in support of defendant's argument and they are readily distinguishable from the instant case. There was no provision in the contract under consideration in any of those cases for arbitration, in the event that either or both of the parties considered itself or themselves aggrieved by any decision of an engineer interpreting drawings or specifications. The contract under con-

sideration in this cause contained the following provision:

" . . . *If either the Purchaser or the Contractor considers himself aggrieved by any decision of the Engineer interpreting drawings or specifications, he may require the dispute to be finally and conclusively settled by the decision of arbitrators, one to be appointed by the Purchaser and a second by the Contractor.* In case the two arbitrators thus chosen fail to agree a third arbitrator shall be appointed by...... *By the decision of these arbitrators, or by that of the majority of them, both parties to this agreement shall be finally bound."*

Defendant urges that if the parties meant or intended that this provision should have any binding force at all, it was only meant to cover the interpretation of specifications having to do with charts, drawings, quantities or qualities of material and like technical matters. There is no force to this contention. There is less logic and reason for a resort to arbitration on an engineer's decision, which concerns matters that are purely and strictly technical and the knowledge of which is peculiarly within the possession of a man in the engineering profession, than on a decision of an engineer concerning delay in the completion of a bridge and the cause or causes of such delay.

There is no ambiguity about the provision of the contract concerning arbitration. There would be no occasion for the agreement to arbitrate if the decision of the engineer was intended to be final. The contract anticipated decisions by the engineer in the first instance and resort to arbitration in the event that either or both parties to the contract were not satisfied with such decisions.

Defendant cites *Cocalis v. Nazlides,* 308 Ill. 152, 155, in support of its contention that the "agreement for

arbitration was in no sense binding on defendant.''
Rather than supporting defendant's contention this
case sustains the legality of agreements for arbitra-
tion. On page 155 of this decision, the court said:

''Arbitration by agreement of parties as a method
of settling disputes and controversies by substituting
an arbitrator or arbitrators for a court proceeding
according to the course of the common law was recog-
nized at the common law, and an award might be
enforced by an action at law, or in a proper case a
party could call upon a court of equity to compel a
specific performance of the award. (*Ballance v. Un-
derhill*, 3 Scam. 453.) Specific performance of an
agreement to arbitrate a present existing controversy
would not be decreed by a court of equity, and until
an award was made the authority of the arbitrators
was subject to revocation by either party to the sub-
mission, except when the reference to arbitrators was
by a rule of court. (*Paulsen v. Manske*, 126 Ill. 72;
Morse on Arbitration, 230; *People v. Nash*, 111 N. Y.
310.) Section 3 of the statute revising the law in
relation to arbitration and awards now provides that
a submission to arbitration shall, unless a contrary
intention is expressed therein, be irrevocable. That
provision does not violate any constitutional right,
and the common law rule that either party might
revoke a submission at any time before an award
was made and take from the arbitrator all power to
make a binding award has been modified in that par-
ticular. *White Eagle Laundry Co. v. Slawek*, 296 Ill.
240.''

That possible disputes concerning delay in the com-
pletion of both the substructure and superstructure of
the bridge were anticipated by the parties to the con-
tract is evidenced by clause 3 of the contract, *supra*,
and by clause 16, sec. R-O. of the specifications, which
reads as follows:

" . . . If it appears to the Engineers that the Contractor is delayed by conditions beyond his control, or by conditions of weather, times and seasons, and rivers or streams, so unusual as not to be reasonably anticipated, additional time for completion of the contract will be allowed, to be determined and fixed by the Engineers and Purchaser. . . ."

It appears that both parties were dissatisfied with the decision of the engineer on the liability of the respective parties for delay in the completion of the bridge and that plaintiff, after requesting payment of the unpaid balance claimed to be due it on the contract, made a formal demand on defendant for arbitration of the question of delay and the cause or causes of delay, naming the person selected as its arbitrator. Defendant ignored this demand and by reason of its refusal to conform to the arbitration provisions of the contract plaintiff was compelled to resort to a court of law for adjudication of its claim.

We are of the opinion that the contention of plaintiff that the delays in the completion of the bridge, their duration, what caused them, and the liability for them, were clearly questions of fact that the court should have permitted the jury to pass upon, is meritorious, and that the court erred in refusing to submit them to the jury for its consideration. To hold otherwise would be to hold that a party to a contract providing for arbitration by refusing to comply with its clear, unmistakable terms, could preclude the other party from redress for claimed grievances.

The contract provided for extension of time to plaintiff if failure of the contractor on the substructure to complete his work on time delayed plaintiff, and that "due consideration should be given by the engineer for altered weather and river conditions which may occur under such extended times." The specifications also particularly provided for extensions of

time in the event of the occurrence of conditions beyond plaintiff's control, or by condition of weather, times and seasons. The engineer allowed plaintiff some extension of time, but plaintiff insists that the engineer was not justified in holding it responsible for 105 days' delay. Other contentions have been urged, but in the view we take of this appeal we deem it unnecessary to discuss them. Inasmuch as this cause will undoubtedly be tried again, we have refrained from an extended discussion of the evidence.

For the reasons indicated herein, the judgment of the circuit court entered in pursuance of a directed verdict in favor of defendant is reversed and the cause remanded.

*Reversed and remanded.*

GRIDLEY and SCANLAN, JJ., concur.